Good morning to the court. Scott Chafin for the Plaintiff Appellants, Jeremy Shephard and Michael Jackson. May it please the court, our path toward today began with an allegation in a petition that defendant AIX Energy was the owner and or operator of a well and a request for production for AIX Energy to produce the contract under which defendants conducted operations at the well. With St. Paul providing the defense, AIX answered the discovery, objected, stated that AIX was not conducting operations at the well. After a trial on the merits and a post-trial exception, St. Paul produced a joint operating agreement which identified AIX as the operator of the well and showed that NextEra had assumed 75%... We're there with you. You got a delictual matter under the good old Civil Code which only provides one year. So you've got all these trial provisions so it looks like the rub here is when does the one year start, right? That's right. Our position is that the one year starts when damages come into existence and that's where we believe the trial court appeared because until the suspense... You've got cases that say you don't have to know the full breadth of what all damages you may be entitled to, but if there are discernible damages, that's good. In my recollection, they cite a Supreme Court case in Louisiana. You seem to be arguing no, we're entitled to excess damages. It's not until the fullness of the damages arrive when things turn. So what about the inappreciable? You know you're going to get something so why do you have to know the full breadth before the clock starts? Yes, sir, your honor. And the distinction is, in our view, that we don't have to know the full breadth, we have to know the existence and that until a suspense of appeal is complete, in this case, there was an excess verdict. And until the suspense of appeal is complete, which could reduce liability, apportion liability or damages differently, then the court... But you're talking about apportioning liability of damages to somebody who's not a party to the litigation that you had filed. Isn't that right? Well, yes and no, your honor. If liability or damages had been apportioned to AIX differently, then there would have been no excess judgment, nothing to enforce. And what I would like to ask the court to consider is the ruling that if there is no, if prescription is running during the period of suspense of appeals on excess judgments, bad faith claims for excess judgments, what happens? This is what I want you to help me understand. Yes, sir. You filed a claim against AIX and St. Paul offered up a defense as the insurer. I'm sorry, I didn't hear that. St. Paul offered up a defense as the insurer. Correct. And then it was revealed to you that AIX wasn't the only operator. Is that what happened? It was revealed to us post trial that AIX was in fact the operator. Okay, well, who did you sue first? We sued AIX, Republic Well Testing, we sued a flowback company, we sued everybody who we thought was involved in the well, and then we later added St. Paul. All right, and AIX had told you they weren't involved. They told us, they objected to the request for production, said they were not conducting operations at the well, they said they were the owner of the well. Yes, sir. So, and what I'd like to ask the court to consider is the practical effect of what happens if prescription is not suspended during the period of suspensive appeal. If that in fact is the case, then as soon as an excess judgment is entered and there needs to be a suit for bad faith, the plaintiff bar rushes to the courtroom and there's going to be a barrage of bad faith suits on excess verdicts while suspensive appeals are pending. That's our position, Your Honor, to your question, that we don't have to know the full extent of the damages, but we do have to know the existence of the damages. For example, the cases the defendant cited, our position is that on those cases there were no contingencies to the very existence of the damages, and it would have been the same as in this case. For example, if we had said when Mr. Shepard was burned, we're going to wait to file, we know, we know he has medical bills and we know he needs surgeries, but we're going to wait to file suit until we know the full extent of what he has to have, that would have been improper. And I think that's, that's the distinction in a lot of cases. And we looked at. Okay, but the cases you cited, your opponents say, are excess judgment cases where you're the insured and your insurance company didn't do what it needed to do to get the case settled within the policy limits, and so now you've got this huge amount. Well, first you've got to have gotten that whole trial done and appealed and all that before you know that you actually have an excess judgment and can go after the insurance company. That's a different scenario than this. You didn't receive a judgment against your client. You received a judgment for your client that didn't get fully paid. That's correct, Your Honor. And the, I think it's the, um, Terrio case that when we plead a violation of 1973 B, that the duties apply to third party claimants as well. And so regardless of where the bad faith lies, third party or the excess judgment, third party still has still may bring the claim. Right. I'm not saying you can't bring a claim. What I'm saying is that these cases about you have to finish out the suspensive appeal your opponent says are different because they are dealing with a different case, a different set of facts. They're dealing with an excess judgment, not a failure to achieve as much as you hope for. I got you. Yes, ma'am. And I understand the defendant takes a lot of conceptually what matters is that prescription has to be suspended during the period of suspensive appeal. Otherwise we're gonna be wasting the court's time completely with bad faith suits on excess verdicts that may end up coming back differently from the courts of appeal. And so whether the facts of one case are different or not, surely you're not making a judicial resources argument, sir. I say, surely you're not making a judicial resources. I'm not I think it that there's no reason to go. But you seem to be making a policy reason, not a legal reason. So you seem to be making a policy reasons which whether we agreed which you're not. I mean, as I'm listening to you, you said, first of all, as a practical matter. And then you so it seems you couch it as a policy matter, as opposed to what's the legal piece, either in the civil code or Supreme Court or something that says that you don't that if you says other than if you know appreciably that you have damages, the clock starts to run. And that's the way I'd send the centerpiece of the issue, not the policy issues about whether that's good or bad, right or wrong. But is that when the clock you found me? So help me understand what cases so get you where you want to be, because it seems other cases deal with excess judgments. And there's that's doesn't seem to be where we are. So maybe I'm missing it. So, yes, sir. To answer question, I guess I could go back to the week that we decided what to do in the office. And we read the law. We read the Bellinger case. Judge Haynes, that you were on the panel. Um, and the um, the statement by the court in that was that the distinction and how the excess judgment is appealed terms determines the outcome. In that case, it was appealed, appealed devolutively. And so prescription was not running. Um, this court found the Matthews case persuasive and said that, um, the right to enforce a cause of action for damages based on an insured failure to settle within policy limits does not arise until the entry of a judgment against the insured in excess of the policy limits. And that was a legal basis. But they're saying the damage to you, assuming arguendo that they lied and you relied on the lie. You were damaged thereby because you didn't get to sue next extra. You had agreed, you know that you're just gonna sue these the you found that out the day you found that out, why couldn't you sue and say y'all lied and kept us from being able to sue next era. I'm sorry. Next era. I guess is the name next year. So the trial court's judgment was based on the bankruptcy order, and the trial court's judgment stated that the judgment was unenforceable against A. I. X. And our feeling was that since next era's liability under the joint operating agreement was derivative of A. I. X. And depended on our ability to enforce it against A. I. X. That we could not see next year. Okay. You didn't think you could sue next next era ever. I mean, had you not reach that bankruptcy court agreement and then you found out about next year, are you saying you couldn't have sued them? So you're saying the lie didn't matter. Well, it did, in fact, happen. And so once that judgment was entered, that said it was unenforceable against A. I. X. I thought was that since again, next era's liability was derivative of A. I. X. Is that it couldn't be enforced. So that was only because of the agreement you reached, right? Right. But we basically. And so as I'm understanding, I mean, let's be sure I understand what you think is lie caused because if people just randomly lie that that doesn't matter, it's what it causes that matters. I thought y'all's claim was we wouldn't have agreed to that whole deal where we're just going to go to ST Paul on the A. I. X. Insurance if we'd known about next era. So once you learn about next era, why can't you sue for that fraud at that that day? So to to address that, I guess, in both points in time, number one, we didn't know that number one next era had any liability itself. And number two, we wanted to go pursue next. There was an insured of ST Paul. And so we wanted to go pursue applicable insurance policies to see what other policies exist. And there's been a post trial policy. But my question isn't suing next era on March, whatever day that was, but rather suing ST Paul for the lie. That's your case. Next year in here today, your case is suing ST Paul for the lie. Why didn't we see ST Paul that day? Yes, that's what this case is. I feel like we're like not connecting because I thought that's what this case was about. They had run on your suit against ST Paul for the lie. Right. So my question is, why couldn't you sue ST Paul for the lie on that March date when you Wow. Oh, my heck found out because our interpretation of the law was that is and still is that until all contingencies are resolved, there is no there is no suit. And then we had to wait for the period of didn't see ST Paul at that time. So you thought you couldn't even bring a brand new claim because you had a whole different claim on the misrepresentation from the one you had brought already. So you thought you couldn't bring any claim against them at all, knew or not. We thought we could, depending on the outcome of the appeal. I mean, if the appeal had come back less with no excess judgment, then we couldn't have sued ST Paul. But once it came back with an excess judgment, then we said, Now we can see ST Paul for the bad faith on the excess judgment. I hear it. I just don't understand. The moment I found out they lied to me, a court would have had to tell me I couldn't. But well, and there are cases that say that that's premature. I mean, we're concerned about an exception. Prematurity. The I think it's the Matthews case found that that suit was, in fact, premature. And so we thought we would have been facing the worst thing would have happened is, you know, an exception would have been filed for prematurity and you'd have been out. But it wouldn't have prejudice you forever from going forth when it wasn't premature. We think it would have, Your Honor. And the reason we do is we think because our appreciation of law is that facts which come into existence later do not affect the prescription period for running on a claim for prematurity. And based on what? I mean, I'm just not following what legal premise, what case or the civil code article that's saying what you're saying. I hear your argument. You're saying this is what we thought, but I'm not able to anchor it to what case from the Liz's Supreme Court Court appeal or something that stopped you dead in your tracks to say, No, we can't go there. I mean, that's I mean, I read the brief, but that's problem I'm having is I don't understand what came. You said we read this case to say X and that's what we relied on. But it turns out that's not case. I haven't heard you say what is the case that you say that y'all relied on? Yes, sir. And I apologize. We believe it's the Matthews case, which this court in Bellinger stated it found persuasive. And in Matthews, the claim was found to be premature. Yeah. Okay. All right. Well, we have your argument, but you saved your time for rebuttal. So we'll see what ST Paul. Thank you, sir. All right. Are you pronounce it? You share? He shake. Yes, Your Honor. Thank you. I was. I was tipped on to get there. So go ahead. Good morning, Your Honors. May it please the court. Jogi Shay on behalf of ST Paul Fire and Marine Insurance Company. The district court correctly ruled that the plaintiff's claims are prescribed under Louisiana law plaintiff's arguments to the contrary fail for three reasons, and I think the court just highlighted all three of them. During that opening session, the plaintiff's argument misstates the applicable law as to when injury or commencing prescription under Louisiana law. It ignores the actual and appreciable harm that the plaintiff's necessarily sustained more than one year before they filed suit, accepting their allegations and theory of the case as true. And it is founded on case law that is inapplicable to the claims at issue. Okay. I just want to be sure I understand Louisiana law on this. Had they filed in March of 2017? Let's say March 31, 2017. They filed a lawsuit and said, ST Paul, you're a bunch of liars. Have a nice day. And that was their lawsuit. And you all said, Oh, well, wait a minute. We've got to have this. This is premature. We've got to have this appeal decided. And, you know, blah, blah, blah. And the judge agreed with you on that and found it premature. Would it be a dismissal without prejudice? Or what would happen? I know it doesn't, um, start the clock running on on prescription or stop the clock running on prescription. But would that have been a dismissal without prejudice of the case? That is correct. And then if so, having ruled that, then if in November, you know, they win the appeal and so on. November 2018. Then they sued. Y'all couldn't then say, Oh, wait a minute. This is untimely. You would have been bound law, the case and all that. That is correct. Okay? Yes. It's a It's a prescription under Louisiana law. I'm sorry is an exception under Louisiana law, and it is just it's a defense to the action. It doesn't say that the action cannot proceed. It simply says that the action is premature at this time. So if the district court sustained that exception, that would just mean that we'd have to wait. But that's not what happened here. Um, and I think part of the flaw in the analysis result. But I just want to understand, though. I mean, again, I were not trying to create a policy here, but I just wanted to be. I just wanted to be sure we weren't, you know, making it impossible either way. Because, you know, they apparently sat around a table and thought, Oh, we shouldn't sue until November or until the appeal is over. Um, but had they chosen to sue and it was found premature, that would not have forever barred the lawsuit. Assuming arguendo, they won the appeal, which they did. That is correct. Okay. Unlike statute prescription or statute limitation. Correct. The prematurity exception is not a forever barring exception. Correct? Correct. Your Honor. And counsel opposite is arguing as if it is, but it's not. It's just come back when it's right, right? Correct. Your Honor. You can't come back when the prescription tolls so you can come too early. But if you wait too late, when the time limit runs, you're shot out of the water. But in this instance, that wouldn't have been all right. Let's anyway, the court ruled that these plants had knowledge of an appreciable amount of their damages, and thus that's when they would have found. And that's what I understood the Supreme Court case to say and so forth. Counsel opposite is saying all this about. Well, there had been a suspensive appeal and so on and so forth and all that. So respond to his arguments about the presence or absence of a suspensive appeal and how that necessarily impacted the decision that they made. Okay, Your Honor. I think that argument flows from two mistakes. First, it's a fundamental misunderstanding as to the applicable standard as to when your damage is sustained for purposes of prescription under Louisiana law. In their briefs and again today at the podium, we heard that until all contingencies with regard to the plaintiff's damages have been sustained, the cause of action does not begin to accrue and prescription does not begin to run. That is simply not the law. The Louisiana Supreme Court rejected that concept in Harvey versus Dixie Graphics and in the Rain State Bank case. In both of those cases, the Supreme Court was addressing certain tort claims and they found that prescription began to run as soon as the plaintiff suffered the first actual and appreciable harm, even though there were many contingencies left to be resolved in those cases. In the Harvey case, it was a claim against a tax preparer where the IRS that there may have been a deficiency in the tax return. The court held that prescription began to run as soon as the plaintiff sustained any harm or injury, which it thought was the company owner conducting and investigate its own inquiry into the validity of the tax return or deficiencies. Okay, so March 2017, we're going to continue to assume that it was a lie, since, as you say, we have to assume that their facts are correct. So they found out about the lie March of 2017. What could they sue St. Paul for? Again, just saying a lie, if I say, oh, that window is five feet tall, that's clearly a lie, but it didn't make any difference to anybody. Nobody's doing anything different as a result. So obviously it matters that the lie has some effect. And they're saying the effect only is if their excess verdict ultimately was affirmed, then they could have recovered a bunch more money had they known about your lie sooner, but they didn't. But if they don't recover that, if y'all had won the appeal or at least narrowed the amount, then they'd have nothing to recover. That's the core of their argument. So please address that. March 2017, they sue and win that day. What do they get? Well, Your Honor, the question is, basically, what was the actual or appreciable harm that they sustained prior to that date? Is that correct? Well, I'm asking you, okay, you're saying they should have sued you March 31, 2017 or within a year of that. Right. Okay, so they sue you March 31, 2017, and let's just, you know, play a game here and say they won that day. What would they win? They would, well, presumably the claims would have, the same claims would have been asserted, 1973b1 claim and presumably these tort claims. We obviously have issues with those claims outside of this, but they would have won recovery for the harms that they necessarily sustained outside of the judgment that exceeded the policy limits. And what is that? But the harm that they sustained was the loss of rights and opportunities in the underlying litigation and the benefits that would have flown from those, the exercise of those rights and opportunities, had they known of the existence of Nextera and the Joint Operating Agreement. And what is that? Specifically, as the District Court recognized, they could have sued Nextera in the underlying case. Their entire theory is they had a right against Nextera that they didn't get to execute on. Had they known this information at the very beginning, they could have named Nextera as a defendant. They could have conducted discovery regarding Nextera and the Joint Operating Agreement in the underlying case. Had the statute of limitations run on suing Nextera when they, when they discovered the existence of Nextera? No, Your Honor. No. They had, depending on how the analysis happens under Louisiana law, arguably they were, the plaintiffs contend that they were a solidary obligor, or at least they did in the District Court briefing. Because I'm just still stumped. I would have sued St. Paul and Nextera the day I discovered the lie. But, yes, obviously they didn't do either one. Yes, Your Honor. And I understood Your Honor's question to be, could they have sued Nextera in the underlying case? And, right, I understand you're responding to Judge Hainquist. And that's what they lost by virtue of the lie. And I say they could have. We actually take issue with the fact, we disagree that they actually have a claim against Nextera. But assuming, for purposes of this motion, the, the facts they allege are true and their theory is correct. But they're saying that, you know, the problem is, how do you value that? So, you know, filing a lawsuit is great, but if you're suing for damages, you have to be able to aver some damages. And what are those damages until we know that the excess verdict stands in place? So the other damages that they sustained included the loss of the ability to try to settle with Nextera. Again, if they had known of the existence of Nextera early on, sued them. The plaintiff's claims ended up being worth in excess of $20 million. The plaintiffs allege that Nextera was liable for 75% of that liability. That's a significant claim. And they lost the opportunity to try to settle with that entity before the agreed order was entered into the bankruptcy court. When the agreed order was entered into the bankruptcy court, that prohibited the plaintiffs from pursuing Nextera basically as an, as a, an indemnitor of AIX. So essentially, you have, we have additional losses as well, of harms that we allege that they sustained as well. But ultimately, I think Judge Haynes, perhaps your question is, how do you prove these damages? I, I like in this case, I mean, it's a loss of litigious rights, first off, and loss of opportunity to sue a potentially viable defendant on a significant claim. The value of those claims, we don't really know. We didn't know at that point. I think we have more insight now. But under the Louisiana Supreme Court precedents, you don't need to know the facts to look to see if there were any earlier actual and appreciable harm or damages that were sustained. Granted, Your Honor, if we ended up in that litigation, the roles would be reversed. The plaintiffs would be arguing that these were actual damages that they sustained. And as a defense lawyer for St. Paul, I would argue that they weren't. But I think looking at the case, these are harms that they sustained. The question really becomes one of value. Now, I think the plaintiffs would, you know, just like any other case involving litigious rights or non-pecuniary losses, both sides would bring in experts and provide their own opinions on what the value of those damages were. And that would be adjudicated. As a plaintiff, you would have gone in front of the court and said, Your Honor, look, there's a piece of this case that's still being resolved. Let's, you know, we can continue on with discovery. We can continue on preparing this case for trial. But there's an element of damages that still needs to be resolved. So let's take this slow. I've been in many cases like that. I'm in a case right now in federal court in the Western District involving a plane crash. And everybody knows the NTSB report is going to be an important piece of this case. We get a scheduling order that allows us to conduct discovery and get ready for the trial, but knowing that it's prolonged a little bit for the NTSB report to come out. I think that same thing would have happened here. The plaintiffs should have filed their claim. We could have approached the court and said, Look, there is an element of damages to this claim that is still subject to review. And we would have just proceeded along. We could have gotten started in all the other aspects of the case. We could have litigated whether 1973B1 even provides them a cause of action. We could have handled all manner of things. And ultimately, once that judgment was affirmed, the case would have wrapped up at that point. I would like to very briefly address the fact that under 1973, well, actually, one more step. I would like to make clear that this is not speculative harm that we're talking about here. And I think the best way to look at that is if the plaintiffs had conducted additional discovery in the underlying litigation and learned of the damage in the joint operating agreement, let's say two months after the alleged misrepresentations, I think at that point it would be fair to say that whether the plaintiffs had sustained any damage at that point in time was speculative. Because then, at that point, they could have added Nexterra as a defendant. They could have attempted to Those were actual harms. It put them in a worse position under their theory of the case. So those are actual harms sustained. The other issue I wanted to briefly address was 1971. As we addressed in the briefs, the claim by the plaintiffs against St. Paul under 1973, the misrepresentation claim, the bad faith claim, is premised on the same misrepresentation. Under that statute, the Louisiana Supreme Court has decided that damages is not an essential element of that offense. So for that claim in particular, that claim necessarily arose as soon as they acquired knowledge of the alleged misrepresentation. So that claim should be found to have prescribed as well. We also briefly addressed in our brief several alternative grounds for affirmance of the case. And I think the most fundamental one that I just want to touch on a little bit was the fact that this claim seems inappropriate at all to present as tort claims and as a bad faith claim. The claim is fundamentally a discovery violations claim, although they do allege also some pleadings violations. We actually dispute the substance of those claims. But the Supreme Court in the quality environmental case addressed a very similar situation and said basically the plaintiffs in that case were trying to argue that discovery violations constituted an independent cause of action under the Louisiana Unfair Trade Practices Act. And the Supreme Court said, look, you're elevating what is essentially a discovery dispute into a claim under the Louisiana Unfair Trade Practices Act, and that's not recognized by our jurisprudence. And basically the court looked at the purposes for the Unfair Trade Practices Act and said, essentially, even if your allegation meets all the elements of this offense, you should be taking this to the district court under our code. This is a code of civil procedure violation. It should be taken to the judge that is presiding over the case. And we submit that's exactly the same thing that should have happened here. Plaintiffs learned of this alleged misrepresentation while the underlying case was still before the district court. This should have been taken to the district court judge who was presiding over the case. That judge could have, under the civil code, I'm sorry, under the code of civil procedure, that judge is granted the authority to make and issue sanctions for violations of discovery, in discovery. And we just submit that that is how this should have proceeded in this case as well. Unless the court has any further questions for me. All right. Thank you, sir. Thank you, Your Honors. All right. Mr. Chaffin, back to you for rebuttal. Yes, sir. Thank you. And Judge Stewart, I'd like to address one of your questions about prematurity and the exception of prematurity. As we cited in our brief, prematurity cannot be cured by facts that come into existence after the premature suit. We talked about that. But secondly, a premature suit does not suspend the running of prescription. That's the Louisiana Supreme Court in the Citroen versus Avondale case. But you don't have to suspend it if it's premature. So, I mean, the bottom line is, do you disagree that if you had filed suit on March 31, 2017, and the court had ruled this is premature and dismissed it without prejudice, that would not have prevented the litigation you then filed in December of 2018, right? I do disagree with that. Okay. Tell me what case says that's wrong. That a premature suit does not suspend the running of prescription. That's the Citroen case. And the reason is, if we had filed suit in March of 2017, exception of prematurity, and it's dismissed without prejudice, we can bring it later. We go all the way through March of 2018, we get to November 5th of 2018 when the Supreme Court has denied writs. We're now a year plus over. And if a premature suit does not suspend the running of prescription, we're prescribed. But why wouldn't that be law of the case? I'm ... Why would not your opponent be bound by the prior ruling that they obtained, and that's law of the case, that it was premature then, which would mean that it's not prescribed now? I don't know any cases that represent that. I don't know the answer to that. But this case is not turning on the exceptions in the code. I mean, I just don't understand it. It's not. I mean, and nobody's arguing that the exception of prematurity stops the statute of limitation of prescription. That's not the argument made. The point was you were saying we sat around a table and decided, you know, when to file, et cetera, and the point was just you said we didn't want to be bounced out. Worst happens you file, somebody says premature, but nobody's saying you can wait until the statute runs and then come back and say, you know, it was premature. You still got to observe the one-year period. And this case turns on, when did the clock for one year begin? And the other side is arguing in the case the district court says the clock started to run when there was an appreciable amount of damages known. That's when suits was filed. So we're overheading the exceptions to me as a rabbit trail as opposed to the cut. I understood your argument, Mr. DeBriese, was that this excess judgment, suspensive appeal, all this somehow gave you cover for not having sued, but that just doesn't seem to be the meat of the argument. And I'm still waiting on you to give the best case that says that in this scenario you didn't have any appreciable damages at the point to where you should have filed suit. You understand what I'm saying? Yes, sir. I mean, maybe I'm wrong. I don't see this case turning on what the exceptions in the civil code are. And I understand the question, Your Honor, and I understand the concern. And in the Sultana case, the district court focused quite a bit on whether damages were actual and appreciable. But that was a case that dealt with penalties, whether penalties could be assessed in addition to general and special damages. It didn't deal with prescription. And to answer that very question, Your Honor, I actually looked up the definition of actual, and it says existing. And until our appreciation of the law is that until the excess judgment is finally decided by appeals by Supreme Court writs, however that process ends, our damages do not come into existence. And so it wasn't that— Is there an intermediate Louisiana court of appeal case or a Supreme Court case that stands for the proposition that you just said? Because if so, I certainly want to—we all want to know and follow the law. Right. I mean, beyond you saying it, I'm just saying is there a case that's in your brief or otherwise that says the specter of the excess judgment hoovers over the running of the clock? I mean, that's really the cut issue. So— When does it stop it running? Yes, sir. We looked at the majority in Matthews. I believe that's the way to pronounce it. It's on page 22 of our brief, and it says it is the entry of the judgment on the principal demand in excess of the policy limits that harms the insured and gives rise to the right to enforce the cause of that judgment. That's the insured excess judgment. So, I mean, basically you are relying on these insured excess judgment cases as an analogy to your excess verdict case. That's correct. And I didn't see that there was any distinction drawn between First Party and Third Party claims in those rules. Well, your opponent drew a distinction, and we'll just have—I mean, obviously we'll have to decide if we agree with that. Thank you all very much. All right. Thank you, counsel, on both sides. It's an interesting case to put it mildly. We appreciate your briefing and the oral arguments. The case will be submitted to the panel, and we'll get it decided. We have a handful of not orally argued cases for today, which we'll take up shortly. Otherwise, that concludes the docket for this panel, and the Court stands adjourned.